\_\_\_\_\_ FILED \_\_\_\_\_ ENTERED
\_\_\_\_\_ LOGGED \_\_\_\_\_ RECEIVED

JUL 3 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * Criminal Case No.: 1:17-mj-3030-SAG |
| SHAWN E. HAWK, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On August 1, 2017, Defendant Shawn E. Hawk ("Mr. Hawk") was arrested and issued citations for: (1) driving under the influence of alcohol *per se*, ECF 1; (2) driving under the influence of alcohol, ECF 3; (3) driving while impaired by alcohol, ECF 5; and (4) driving on a suspended driver's license, ECF 4. On January 3, 2018, Mr. Hawk filed a Motion to Suppress all evidence seized as a result of his arrest, namely the ensuing breath test, arguing that the officer lacked probable cause for his arrest. ECF 10. On February 23, 2018, the Government filed its Opposition to Mr. Hawk's Motion. ECF 16. On June 5, 2018, this Court held an evidentiary hearing. ECF 20. For the reasons set forth below, Mr. Hawk's Motion to Suppress will be granted.

### I. FACTS

The following factual summary is derived from the recorded hearing testimony. On August 1, 2017, Officer Thornton (ID #1173) was monitoring vehicular traffic entering and exiting Fort George G. Meade ("Fort Meade"). In particular, Officer Thornton was stationed in the rejection lane at Vehicle Control Point 2 ("VCP-2"), which is located off of the Baltimore-Washington Parkway's southbound exit onto Fort Meade. As background, Officer Thornton

1

testified that, "due to the high number of individuals who mistakenly or intentionally take that exit" without proper authorization to enter Fort Meade, the rejection lane at VCP-2 is specifically designed to investigate these individuals without impeding the normal flow of traffic. Officer Thornton further indicated that, though there are five traffic signs expressly stating that Fort Meade's exit at VCP-2 is "restricted property," permits "authorized personnel only," and that all persons entering are "subject to search," two of the signs are displayed at a point along the exit route where drivers can no longer legally turn around without first entering Fort Meade.

At approximately 7:30 a.m., Officer Thornton observed a white Chrysler approach VCP-2. Thereafter, Officer Thornton received a radio call from VCP-2 informing him that there was a "vehicle rejection," because the driver of the white Chrysler lacked the proper credentials to enter Fort Meade. Accordingly, the vehicle was directed to the VCP-2 rejection lane, where Officer Thornton identified the driver as Mr. Hawk. Officer Thornton explained to Mr. Hawk that he was on restricted government property and that, after conducting some background investigation, Mr. Hawk would be permitted to exit Fort Meade. A license and registration verification through the National Security Administration ("NSA") police dispatch, however, revealed that Mr. Hawk's Maryland driver's license was suspended.[1]

As a result of his suspended license, Mr. Hawk was no longer free to exit Fort Meade, and Officer Thornton requested that Mr. Hawk step out of his vehicle. Upon complying, Mr. Hawk was instructed to open all of his vehicle's doors and interior compartments for search. In response to Officer Thornton's questioning, Mr. Hawk stated that he was lost, and was attempting to attend a mechanic's training near Annapolis Junction, Maryland. Officer Thornton testified that the nearest public road to Fort Meade's VCP-2 exit is Technology Drive, which is in the Annapolis Junction area.

---

[1] Mr. Hawk did possess a valid Virginia driver's license.

Upon finalizing Mr. Hawk's citation for driving on a suspended Maryland driver's license, Officer Thornton detected, for the first time, a "moderate" odor of alcoholic beverage on Mr. Hawk's breath. Mr. Hawk told Officer Thornton that he had consumed alcohol the previous evening. Consequently, Officer Thornton decided to conduct Standard Field Sobriety Tests ("SFSTs") to determine whether Mr. Hawk was under the influence of, or was impaired by, alcohol. Mr. Hawk completed the SFSTs under "sunny" conditions and on VCP-2's "relatively flat" rejection lane, which is marked for administration of the SFSTs. According to Officer Thornton, Mr. Hawk denied having any medical conditions that could impact his ability to successfully complete the SFSTs.

Officer Thornton conducted four SFSTs: the Horizontal Gaze Nystagmus ("HGN"), Vertical Gaze Nystagmus ("VGN"), Walk and Turn ("WAT"), and One Leg Stand ("OLS") tests.[2] In conducting the HGN test, Officer Thornton observed six out of six possible clues. According to Officer Thornton, exhibiting four or more clues during the HGN test suggests that the subject may be impaired by alcohol. Officer Thornton did not observe any relevant clues during the VGN test. Further, during the WAT test, Mr. Hawk made heel-to-toe contact on all eighteen steps with his arms at his side and without stepping off of the line. Mr. Hawk did make an improper turn, which constituted one clue, but Officer Thornton testified that exhibiting two or more clues suggests that the subject may be impaired by alcohol. Finally, the OLS test requires subjects to raise their leg of choice approximately six inches off of the ground for thirty consecutive seconds. The four clues for the OLS test include the subject: (1) raising his or her arms; (2) swaying; (3) hopping; or (4) putting his or her foot down to the ground. Officers look

---

[2] Counsel for Mr. Hawk questioned Officer Thornton's qualifications/training to successfully conduct SFSTs, and presented some evidence that Mr. Hawk's individual SFSTs may have been improperly conducted. This Court need not reach that issue, because even assuming Officer Thornton was adequately trained and the results of the SFSTs were accurate, Officer Thornton still lacked probable cause to arrest Mr. Hawk for an alcohol-related offense.

3

for a showing of at least two clues during the OLS test to suggest intoxication. Mr. Hawk exhibited none.

Based on the HGN test results, the odor of alcohol detected on Mr. Hawk's breath, Mr. Hawk's admission that he had consumed alcohol the previous evening, and the fact that Mr. Hawk admitted he was "lost" when entering Fort Meade without proper credentials, Officer Thornton arrested Mr. Hawk on suspicion of driving under the influence of alcohol. Importantly, however, Officer Thornton testified that he did not observe any other indications that led him to that conclusion. Specifically, Mr. Hawk had no difficulty: (1) providing Officer Thornton with his license and registration; (2) exiting the vehicle and opening his doors; (3) responding appropriately to Officer Thornton's questions without slurred or incoherent speech; and (4) walking to and from the location where the SFSTs were conducted. Moreover, Mr. Hawk exhibited no stumbling or lack of coordination throughout his interactions with Officer Thornton, and did not require repeated instructions in order to complete the SFSTs. Finally, Officer Thornton did not observe Mr. Hawk commit any driving infractions.

Officer Thornton and the Government considered Mr. Hawk's mistaken entry onto Fort Meade to be a factor contributing to probable cause. On cross-examination, then, Mr. Hawk sought to determine the frequency with which individuals without proper credentials mistakenly take the exit into VCP-2, are directed into the rejection lane, and are either: (a) subsequently arrested; or (b) permitted to exit Fort Meade. Officer Thornton testified that, though the NSA tracks and retains this data, it is classified. In response to this Court's specific inquiry, the Government reiterated that "the statistical data on the number of [VCP] rejections . . . is classified and cannot be sufficiently sanitized to the UNCLASSIFIED level in a way that would be helpful to the court's deliberations." ECF 24.

## II. LEGAL STANDARDS

"Arrest without probable cause violates the Fourth Amendment." *Jolley v. Harvell*, 254 F. App'x 483, 486 (6th Cir. 2007) (citations omitted). Probable cause exists where the facts and circumstances are "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Walker*, 607 F. App'x 247, 253 (4th Cir. 2015) (citation and internal quotation marks omitted). Probable cause is examined under "an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.* (citation and internal quotation marks omitted). Thus, to determine the existence of probable cause, courts "examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [courts] do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *Id.* (citation and internal quotation marks omitted). Importantly, "suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations." *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

## III. ANALYSIS

Under all of the factual circumstances presented, this Court finds that Officer Thornton lacked probable cause to arrest Mr. Hawk on suspicion of driving under the influence of, or

while impaired by, alcohol. Accordingly, all evidence seized as a result of that arrest, specifically the results of his subsequent breath test, must be suppressed.[3]

As discussed above, Officer Thornton believed that probable cause to arrest Mr. Hawk existed, because: (1) he detected a "moderate" odor of alcohol on Mr. Hawk's breath; (2) Mr. Hawk admitted to consuming alcohol the previous evening; (3) the HGN test revealed six out of six clues; (4) and Mr. Hawk admitted to being lost when he mistakenly entered Fort Meade without proper authorization on a "sunny" day. As a preliminary matter, this Court is unable to infer intoxication from the fact that Mr. Hawk mistakenly took the wrong exit off of the Baltimore-Washington Parkway, and entered Fort Meade without proper authorization. The rejection lane at VCP-2 is specifically designed to handle and investigate vehicles that lack proper authorization to enter Fort Meade, and to do so without impeding the normal flow of traffic entering and exiting Fort Meade. Officers are assigned to monitor the rejection lane. The number of individuals who mistakenly take the VCP-2 exit and are directed to the rejection lane on a daily, weekly, or monthly basis is unknown, and the Government has declined to produce the information, citing its classification. This Court notes that Mr. Hawk stated that he was looking for Annapolis Junction, an area which Officer Thornton testified was accessible from the public road nearest to Fort Meade's VCP-2 exit. In other words, Mr. Hawk may have missed his destination by only one exit. This Court finds that, at least without the presence of VCP rejection statistical data or other evidence suggesting that intoxication is a primary cause of mistaken entry onto Fort Meade, Mr. Hawk's wrong turn does not bolster Officer Thornton's probable cause assessment.

---

[3] Officer Thornton had clear probable cause to arrest Mr. Hawk for driving on a suspended license. The Government does not suggest, however, that a breath test could be administered in connection with that offense.

The Government relies on *United States v. Muir*, No. 8:13-MJ-03005-TMD, 2015 WL 2165570 (D. Md. May 7, 2015), to support its argument of probable cause. ECF 16 at 3. In *Muir*, the court held that probable cause existed to arrest the defendant on suspicion of drunk driving, in part because of the results of his HGN test and the odor of alcohol detected on his breath. 2015 WL 2165570, at *1. Included in that officer's probable cause determination, however, was the fact that, while the officer's emergency lights were activated, the officer observed the defendant speed past his vehicle and come "within one to one and a half feet of striking [its] front end . . . ." *Id.* Moreover, after the defendant sped by the officer, the officer attempted to initiate a traffic stop and was forced to pursue the defendant "for about five minutes" until the defendant ultimately stopped. *Id.* Here, in contrast, Officer Thornton did not observe Mr. Hawk commit any traffic violations, nor did Mr. Hawk nearly cause an accident or fail to respond to police instructions. Accordingly, the significant evidence that accompanied the defendant's odor of alcohol and HGN results in *Muir* is wholly absent from the facts before this Court.

Instead, other cases denying motions to suppress and finding the existence of probable cause routinely rely upon the presence of additional incriminating evidence. *See United States v. Saint-Sarin*, No. 1:17-CR-00075 (GBL), 2017 WL 2728035, at *2 (E.D. Va. June 22, 2017) (holding that, though the defendant did not exhibit any clues on the WAT and OLS tests, probable cause existed because the defendant committed seven lane violations, exhibited all six HGN clues, had "glassy" and "watery" eyes, and an alcoholic odor on his breath); *United States v. Walker*, 607 F. App'x 247, 253 (4th Cir. 2015) (affirming the district judge's holding that probable cause existed, because there was evidence that the defendant had alcohol on his breath, stumbled at least once on his walk to the rear of the vehicle, had been driving erratically with

7

several traffic violations, and had admitted to consuming two alcoholic beverages); *United States v. Atwell*, 470 F. Supp. 2d 554, 575–76 (D. Md. 2007) (finding probable cause existed where the defendant smelled of alcohol, exhibited bloodshot eyes, slurred and incoherent speech, and failed SFSTs). Here, however, Mr. Hawk adequately completed the VGN, OLS, and WAT SFSTs. Moreover, he committed no driving infractions, appropriately provided Officer Thornton with his license and registration, had no difficulty exiting his vehicle and opening the doors for search, responded appropriately to all of Officer Thornton's inquiries without slurred or incoherent speech, and walked to and from the SFST location without incident.

Accordingly, this Court finds that the results of the HGN test, the "moderate" smell of alcohol on Mr. Hawk's breath, which was not apparent during Officer Thornton's initial interactions, and Mr. Hawk's admission that he had consumed alcohol the previous evening, together, were insufficient to establish probable cause to arrest Mr. Hawk for alcohol-related offenses, in light of the totality of the circumstances presented in this case. Consequently, Mr. Hawk's Motion to Suppress is granted.

Dated: July 3, 2018

/s/
Stephanie A. Gallagher
United States Magistrate Judge